Smith v. Clayton.

JACOB I. SMITH *vs.* JOB T. CLAYTON.

1. If the court, by a general order to the clerk to discharge such jurors as desire to be excused, reduce the panel below the number required for the trial of a cause, it is good ground for challenge to the array; but if there is no challenge to the array, and the court order a *tales* to be summoned, although such order is excepted to, the verdict will not be set aside upon the ground of illegality in empaneling the jury.

2. A. leased to C. certain premises for five years from April 1st ensuing. The lease contained the following clause: "Should the said A. sell the last-mentioned lot at any time after the said C. has planted the same, he shall have the privilege of sowing grain on the same." And another clause of the lease provided that "should A. sell the lot, then the agreement with regard to that lot to be null and void." C. planted the lot in May, and A. sold it in June following. C. sowed oats on the corn ground the succeeding spring: *held*, that by the terms of the lease the lessee was not confined to sowing winter grain in the fall after the corn, but was entitled to sow any kind of grain at the usual time of sowing it, and that he had a right to sow and harvest the oats sown after the first day of April in the spring after the land was sold: *held also*, that it was the duty of the

court to decide what was the meaning of the word "grain," as used in the lease, and that evidence of its meaning as used in common parlance was not admissible.

3. It is the duty of the court to interpret written instruments, the meaning of words and their grammatical construction, according to the general rules and usages of the language, as matters of law; but if a local or provincial usage, or a usage as applied to a particular branch of business, is meant to be established, evidence of common usage is competent.

4. Where evidence of common usage is improperly admitted, if the jury decide the case correctly the court will not interfere with the verdict.

Case certified from Monmouth Circuit.

Argued before the Chief Justice, and Justices ELMER, HAINES, and BROWN.

*J. Parker*, for plaintiff.

*J. D. Bedle*, for defendant.

The CHIEF JUSTICE. This case comes before us on a certificate from the Monmouth Circuit.

The controversy was in relation to the ownership of a quantity of oats in the straw, cut by the defendant from a lot of land, the property of the plaintiff, which had been sown upon the lot by the defendant, while he had possession of it under a lease from Devine Alger, who was the former owner of the land, and had conveyed it during the tenancy of Clayton, the defendant. The principal question turned upon the construction of a clause in the lease between Alger and the defendant, which was for five years from the first day of April, 1859.

The lease contained a stipulation, that if the lessor should sell the lot, (on which the oats was afterwards sown,) that the lease with regard to that should be void; and also, that if a sale of it was made at any time after the lessee had planted it, he should have the privilege of sowing grain on the same. The deed for the land was made and delivered the 18th June, 1859. The oats was

Smith v. Clayton.

sown by the defendant in the spring of 1860. He had planted this lot in 1859, when the sale took place.

The court, upon the trial, admitted parol evidence to show that in common parlance the term grain included oats.

Three questions are certified.

1. Whether the cause was tried by a legal jury.

2. Whether, on the evidence, the defendant had the legal right to sow, and take the oats in question.

3. Whether the court erred in admitting evidence of the meaning of the term grain.

The objection to the jury was made by the plaintiff before the cause was ordered on. The plaintiff's counsel moved to postpone the case, because the court had discharged all of the jurors who had desired to be discharged before the case came on, leaving only seven of the panel present. The names of those excused had not been drawn from the box, as provided by law. The court ordered on the trial. The plaintiff excepted, and, on application of the defendant, a *tales* was ordered and returned against the plaintiff's objection.

After the court refused to postpone the cause the plaintiff moved his case, and the court ordered the *venire facias* returned, and the return was made. The plaintiff might have challenged the array upon the ground of the previous illegal proceedings, if he thought them so; and if the challenge was determined against him his objection would have been upon the record, and error would have been assignable for overruling the challenge. By failing to make the challenge he has lost his right to except to the jury. The decision of the court upon the motion to postpone was final; it could not be reviewed by writ of error. The jury having been sworn without challenge to the array became a legal jury, although the previous decision was illegal. Whether the previous decision was erroneous or not, it is not now necessary to decide.

The power of the court to excuse a juror from the

general panel for cause is not doubted, and it may well be questioned whether the legal validity of the excuses rendered, or the action of the court accepting them, can thus collaterally be called in question.

The provision of the section providing for drawing a certain number of names from the box, (*Nix.* 385,) seems to be merely directory. The subsequent section of the act, (*Nix.* 385, § 31,) authorizing a *tales*, seems to proceed upon this idea. It provides that if by reason of challenges or the default of jurors, *or otherwise*, &c., a sufficient number cannot be had of the original panel to try the issue, then the court is authorized and required to award a *tales*, &c. This covers the case of a deficiency of jurors, no matter how occasioned. Any other construction would seem to be eminently inconvenient and embarrassing to the administration of justice.

As to the next point certified, whether the defendant had legal right to sow and reap the oats in question.

The land was sold, after the defendant had planted a crop on the lot in question, in June, 1859. In that event the express words of the lease are, he shall have the privilege of sowing grain upon the same. The lease was terminated in June, 1859, by the sale; he sowed the oats in April or March, 1860. This is a question between the tenant and vendee of the land; it could make no difference to the vendee whether he sowed wheat or oats; wheat, if sown in the fall of 1859, would be reaped in the summer of 1860, and so would the oats, if sown in the spring of 1860.

It is a question of legal right what power do the words give the tenant, not whether it is good husbandry to sow oats in the spring on the previous year's corn ground.

The stipulation in the lease was intended to give the lessee the right to the crop he had in the ground when the sale took place, and another one of grain, to be grown on the same land. This compels us to determine

whether the word grain includes oats. Webster defines the word to mean, when used without a definitive, "corn in general, or the fruit of certain plants which constitute the chief food of man and beast, as wheat, rye, barley, oats, and maize." *Bouvier's Law Dict.*, title " *Grain*," gives the same general definition. Nor is there anything in the other terms of the lease to show that the word grain was used in a restricted sense. The defendant is entitled to have the word construed in ordinary sense by the settled rules of construction.

There can be no doubt but that the defendant was entitled under the clause to sow and reap the oats.

As to the remaining question, whether evidence was properly received to show the meaning of the word grain, what has already been said would render a decision on this point unnecessary, if it had not been certified to this court. The word is not a technical term, the signification of which is only known to those of the trade. In such a case parol evidence is admitted of necessity for the same reason that an interpreter must be employed to translate a paper written in an unknown tongue, and it has always been admitted. *Sleght* v. *Hartshorne*, 2 *Johns.* 542; *Gobert* v. *Busby*, 3 *Sim.* 34; *Mechanics' Bank* v. *Columbia*, 5 *Wheat.* 336; *Smith* v. *Wilson*, 3 *Barn. & Ad.* 728; *Richardson* v. *Watson*, 4 *Barn. & Ad.* 789.

An usage may be shown by parol evidence, and some of the cases go so far as to permit evidence that an English word, not a term of art or peculiar to a particular trade or occupation, has a peculiar provincial signification different from its natural meaning, as that a dozen means thirteen.

The evidence was not offered for any such purpose. It was to show the meaning of a common English word, in common use among all classes, as understood by all classes in common conversation. If the evidence was competent, the effect of its reception would have been to draw to the jury the settlement of the question of law.

Such a doctrine would, in almost every case, take the question of law from the court and give it to the jury.

The evidence was incompetent, and should not have been received.

ELMER, J.   The controversy in this case was as to the ownership of a quantity of oats, sowed by defendant on land purchased by plaintiff of defendant's landlord.   A verdict having been found for the defendant, the Circuit Court allowed a rule to show cause why there should not be a new trial, and certified the case to this court for an advisory opinion upon three points.

*First.*   Was the cause tried by a legal jury ?   It appears that, by consent of parties, the cause was set down for trial on Saturday.   Two or three days before the day of trial, the court made an order that all the jurymen who should make known their wishes to be discharged to the clerk could be discharged.   All but seven of the general panel did apply, and were discharged under this order, or had been previously discharged by the court on special application, or did not attend.   Under these circumstances, the trial was ordered on against the consent of the plaintiff, and when a *tales* was ordered, he excepted to the ruling of the court ordering one.

I think the direction of the court, that the clerk should discharge the jurors who applied to him for that purpose, was contrary to the spirit, if not to the letter of the 28th section of the act relative to juries and verdicts, (*Nix.* 385 ;) and if there was any reason to apprehend that injustice had been done to the plaintiff, it would be safest, in the exercise of a sound discretion, to allow a new trial.   But the plaintiff did not challenge the array, and thus present the question in a strictly legal shape ; and if he had, I incline to the opinion expressed by the Chief Justice.   Be this as it may, the verdict being right, I think this question must be answered in the affirmative.

*Second.*   Whether, on the evidence, defendant had the

legal right to sow and take the oats in question? Upon this question the merits of the cause depend. The defendant rented of one Devine Alger the ground on which the oats grew, by a lease bearing date March 6th, 1859, to commence April 1st ensuing, and to continue five years. This lease contained the following clause: "Should the said Alger sell the last-mentioned lot at any time after the said Clayton has planted the same, he shall have the privilege of sowing grain on the same." Another clause of the lease provided that, "should Alger sell the lot, then the agreement with regard to that lot to be null and void." Clayton planted the lot in May. Alger sold it, June 18th, 1859, to plaintiff, and in the succeeding spring Clayton sowed the oats on the corn ground, and having cut it, the plaintiff replevied.

The word grain is defined by Webster to signify corn in general, or the fruits of certain plants which constitute the chief food of man and beast, as wheat, rye, barley, oats, and maize. This being the well established usage of the language, the court should have construed the clause of the lease in question to include oats as well as what is usually termed winter grain. So interpreted, the plain meaning of the whole clause is, that as Alger had the privilege of selling the land, and thereby determining the lease, if it happened that the lessee should have planted the ground before he did so, he should have the privilege of sowing it with any kind of grain he thought proper, at the usual time of doing so, after the sale took place. The reasonableness of this was the more apparent because the lessee had agreed to furnish lime and marl, and apply to the ground at his own expense. It was insisted, on behalf of the plaintiff, that as oats is not usually sown until after the first of April, and as the lessee actually sowed this crop the first year, it could not have been intended that he should sow a second year's crop. If this was not meant, it is only another instance of the extreme looseness and carelessness with which leases and other

Smith v. Clayton.

contracts' are constantly drawn. It is possible that by the phrase, "should he sell the lot at any time after the said Clayton has planted the same, he shall have the privilege of sowing grain on the same," the parties did not mean what it naturally imports, viz., that he might sow whatever grain he pleased, including oats, at the proper time of doing so next after the sale; but to give it any other meaning would be to interpret agreements reduced to writing upon mere conjecture, instead of adhering to the plain meaning of the words adopted by the parties. I am, therefore, of opinion that the second question must be answered that, on the evidence, defendant had the legal right to sow and take the oats in question.

The *third* point submitted is, whether the court erred in admitting evidence of the meaning of the term grain in common parlance. If by common parlance, as here used, is meant the general and ordinary meaning of the word, I think it was erroneous to permit either party to give such evidence, it being the duty of the court to interpret written instruments, the meaning of the words and their grammatical construction, according to the general rules and usages of the language, being *prima facie* matters of law. But if a local or provincial usage, or a usage as applied to a particular branch of business, variant from the common usage, was meant to be established, evidence of this nature would have been competent. 1 *Greenl. Ev.*, §§ 278, 280, note and cases. In this case the defendant was permitted to prove the common usage of the word to be precisely what it was the duty of the court to declare it to be without such evidence. It must therefore be certified, in answer to this question, that the court erred ; but as it was an error which did no injury to the plaintiff, it will be no ground for a new trial.

BROWN, J.    This case is certified from the Monmouth Circuit. The first question is, whether the cause was tried by a legal jury.

The case, on the first day of the term, was set down for a day in term, and was called on that day. Some days before, the court had made an order, this case being the only one not disposed of, that all the jurors who should make known their wishes to the clerk could be discharged. A few of the jurors had been discharged before, and under this order all but seven applied to the clerk, and were discharged by the court. The plaintiff moved to postpone the cause on account of the discharge of jurors, and because only seven appeared. The court ordered on the cause and a *tales*, to which plaintiff excepted.

Parties are entitled to have the full benefit of the drawing of jurors from a general panel by ballot. If by the proceeding of the court this right is infringed, they have not a legal jury. The general panel may be reduced in number when, in the opinion of the court, more attend than are necessary; but the mode of discharging the excess by drawing from the box is prescribed by the 28th section of the statute. *Nix. Dig.* 415. Those whose names are drawn, and no others, can be discharged for the reason that their services are not needed. The court have, by a proviso to the same section, authority to excuse individual jurors, if they assign sufficient reason therefor. In this case, such jurors were discharged as wished to be; the court did not require any reason to be assigned in order to determine its sufficiency. This discharge must be considered as made because the services of the jurors were not needed; and as the mode prescribed by the statute was not followed in order to fix the persons to be discharged, the number remaining were not legal jurors.

The action is replevin, brought for certain bundles of oats; and the second question certified is, whether, upon the evidence, the defendant had a legal right to sow the oats and take the crop.

The plaintiff bought the land on which the oats were grown of Devine Alger, on the 18th of June, 1859. The

defendant had rented the same and other lands of Alger on the 6th of March, in the same year, and claims that, by virtue of that lease, he had right to sow the oats, and take the crop. The agreement contained in the lease, as to the lot on which the oats were sown, is as follows: "Should Devine Alger sell the last-named lot, then the above agreement with regard to that lot to be null and void, otherwise to remain in full force for five years from the first of April, eighteen hundred and fifty-nine. Should the said Alger sell the last-named lot at any time after the said Clayton had planted the same, he shall have the privilege of *sowing grain* on the same."

The defendant, Clayton, did plant corn on the lot in the spring of 1859, and claims, in consequence, that he had a right to sow oats in the spring of 1860. The plaintiff, on the other hand, insists that the term grain, in this contract, does not include oats, and that the privilege of sowing grain did not, according to the true meaning of the contract, extend beyond the year in which the lease terminated by the sale of the land. As to the first point, there is no doubt that the word grain does include oats, as well as corn, wheat, and rye. Corn is excluded from the privilege because it is not sown, but all grain that is usually sown, and not planted, must be included in the meaning of the word. As to the second point, the inquiry is, what was the intent of the parties. It is clear that they meant that the tenant should not be deprived of any customary crop by the extermination of the lease or sale of the land. It is usual to follow corn with winter grain in the fall, or oats in the spring. A privilege to follow a corn crop with grain extends, therefore, to both winter grain and oats. The tenant may choose. I do not perceive that the landlord can have a more restricted construction of this special agreement than would obtain in an ordinary lease on the same provision. It is true that if a lease is for one year, the reasonable construction must be, that all crops authorized to be sown should be

sown within the term ; but in case of a lease that must last, or that may last more than one year, the reason for such construction does not exist.    My conclusion is, that Clayton had a right to sow and take the oats.

The third question is, whether the court erred in allowing evidence of the meaning of the term grain in common parlance.    Courts take official notice of the ordinary meaning of words.    Proof can only be made in cases where usage or the customs of trade attach to them an extraordinary meaning.

HAINES, J., concurred.